Charles A. Loreto, J.
This case was tried by the jury and the court. At the end of the plaintiff’s case, the defendant moved to dismiss the complaint. At the end of the trial, defendant moved for a dismissal of the complaint and for a directed verdict. After the jury rendered its verdict, defendant moved that it be set aside and for a directed verdict in its favor. The court reserved its decision on these motions.
Plaintiff is the beneficiary named in a policy of life insurance in the sum of $50,000 which was issued by the defendant on the life of one Thompson Greene to whom she was married; she has sued to recover double indemnity claiming accidental death under the terms of the policy. Application for the policy was made by the insured on June 21, 1960. It was issued on August 6, 1960, when the first quarter annual premium was paid. And on October 29,1960 the insured was found dead in his apartment submerged in the bathtub filled with water.
The defendant interposed a number of defenses to the action — misrepresentation in the answers to the questions on the application for the insurance made part of the policy, lack of good health of the insured when the policy was issued, misrepresentation of his age, suicide and self-destruction.
In view of the proof adduced the court submitted special issues for the jury to pass upon together with an instruction for a *729 general verdict. The jury returned its finding for the plaintiff on all the special issues but that as to misrepresentation of age. Upon the court’s instruction its general verdict was rendered in favor of the plaintiff in the sum of $67,478.92 representing double the amount of insurance that the premium paid would have purchased for the age of the insured, as found by the jury.
The defendant contends that the proof as to material misrepresentation and good health of the insured requires as a matter of law that the jury’s verdict be set aside and that a verdict be directed in its favor.
Three medical examinations of the insured were had by defendant prior to the issuance of the policy. These are incorporated in the application annexed to the policy and contain the answers of the insured to questions concerning his health.
On the two of them- — Dr. Topping’s and Dr. Danzig’s — to question 12 (e) “ Have you ever had, or been told you had, or been treated for any of the following: * =:;= * Any disorder of kidneys, bladder, male or female generative organs or syphilis 1 ”, the answer of the insured is “ No ”.
On the third examination by Dr. Winter to question No. 17 ‘ ‘ Have you ever had any signs of * * * syphilis ’ ’ the answer of the insured is also “ No ”.
Uncontroverted, unimpeached and uncontested documentary proof was given by the defendant showing that the insured had contracted syphilis on April 1, 1941 and again on May 1, 1942 for which he was confined to the United States Army Hospital from May 1, 1942 to May 17, 1942 and that he was treated for that condition approximately on 60 occasions until his discharge from the service on October 28, 1945. Also it was shown by the army medical records that he was confined to a United States Army Hospital on April 20,1945 with a complaint of a urethral discharge for six months, diagnosed as chronic urethritis, which was treated successfully with sulpha drugs.
And in answer to question No. 12 of the examination by Dr. Winter: “ Have you ever consulted a physician in the last five years 1 ” the insured answered “ Yes ”, stating for “ cold ” and giving the name of only one physician — Dr. Cecil Marquez.
On the trial the defendant produced a Dr. Alfred E. Nesbitt whose testimony was unimpeached and uncontradicted. He testified that he treated the insured from December 15, 1959 to August 1, 1960 (the date of the issuance of the policy) for complaints of pain in the back, an arthritic condition shown on X ray, loss of weight and loss of sexual potency, prescribing for these ailrqeiits.
*730 The uncontradicted finding of Dr. Michelstein who performed an autopsy of the insured states that he found an enlarged and cirrhotic liver.
The Insurance Law (§ 149, subd. 2) states: “No misrepresentation shall avoid any contract of insurance or defeat recovery thereunder unless such misrepresentation was material. No misrepresentation shall be deemed material unless knowledge by the insurer of the facts misrepresented would have led to a refusal by the insurer to make such a contract.” And subdivision 3 of this statute reads: “In determining the question of materiality, evidence of the practice of the insurer which made such contract with respect to the acceptance or rejection of similar risks shall be admissible. ’ ’
Therefore, the question posed is whether under this statute as construed by the court decisions, the misrepresentations of the insured were material.
There is hardly any room to doubt that an important part of any insurance company’s business is in evaluating and discriminately selecting risks which it would expect not to exceed the natural and average losses. Before accepting a risk and issuing a policy for an amount as specified in this policy, invariably the insurer makes inquiry of the applicant as to his prior habits and health, his prior consultations with physicians, requires his answers in writing to an application made part of the policy in which he attests to the truth of his answers. It also conducts, as is its right, its own physical examination of the applicant. The history given by the latter may be quite essential to supplement its own examination of him and any independent investigation or examination by the insurer would not infringe upon its right to avoid the policy because of a material misrepresentation unless its independent investigation or examination either uncovers the falsity of the representation or reveals facts which would reasonably place it under a duty to make further inquiry (29 Am. Jur., Insurance, § 706). Therefore, it cannot be gainsaid that acceptance of the policy is with the understanding that the insurer intends to rely upon the truth of the applicant’s statements.
What constitutes a material misrepresentation sufficient to justify an avoidance of the policy, has been the subject of much litigation with varying results depending upon the wording of the policy, applicable statutes and the jurisdiction passing upon the issue (29 Am. Jur., Insurance, § 702). It does not matter in determining materiality, absent a statutory pronouncement declaring otherwise, that no causal relation existed between the *731 loss or death and thé misrepresented condition. (45 C. J. S., Insurance, § 595, p. 408.)
On the subject of materiality Corpus Juris Secundum states the test to be “ whether knowledge of the true facts would have influenced a prudent insurer in determining whether to accept the risk or in fixing the amount of premiums” (45 C. J. S., Insurance, § 595, p. 406).
However, the test in New York has been laid down by its Court of Appeals in Geer v. Union Mut. Life Ins. Co. (273 N. Y. 261). It gives a narrower test, it is not the test of what any other insurance company would have done, but what the particular insurance company might have done. It is not the test stated in the dissenting opinion of that case, quoting from an opinion in the Federal reports of Judge, later Chief Justice Taft, i.e., ‘ ‘ whether reasonably careful and intelligent men would have regarded the fact, communicated at the time of effecting the insurance, as substantially increasing the chances of loss insured against ” (p. 277). Judge Lehman, speaking for the court, declared (p. 269) the test to be “ The question * * * is not whether the company might have issued the policy even if the information had been furnished; the question in each case is whether the company has been induced to accept an application which it might otherwise have refused ’ ’.
The test is whether the misrepresentation has deprived the company of its right to exercise its choice of risk to take (Reznikoff v. Equitable Life Assur. Co., 267 App. Div. 785, affd. 294 N. Y. 935).
What one insurer might have done in exercising its choice to accept or reject an application for life insurance if truthful answers had been given by the applicant, very well could differ from what another insurer might have done. Surely some health conditions, if known, could undoubtedly bring about universal disapproval. However, there are areas wherein the policy of the company, its experience, incentive and other factors, would bring about differing results as to acceptance or rejection of a risk.
What proof is required to establish this test to the degree that it no longer may be considered an arguable fact, will depend on the facts of the case at hand. The size and manner of the company’s operations are relevant factors on this point.
In Lindenbaum v. Equitable Life Assur. Soc. of U. S. (5 AD 2d 651) where misrepresentation was shown, the defendant, one of the large life insurance companies, offered merely the conclusory opinion of its associate medical director, who testified *732 generally to the effect that his company's knowledge of the insured’s prior medical history would have led to its refusal to write the policies there involved. The Appellate Division did not consider that conclusory opinion of an Associate Medical Examiner, contested, sufficient. It stated that documentary proof, supporting rules and manual of the defendant’s past experience should be adduced to buttress the conclusory opinion of the associate medical director unless such additional proof would clearly be shown not to be available. There a new trial was directed to provide an opportunity to the defendant to furnish such proof, the practice of the insurer having been seriously put in issue on cross-examination. *
When the undisputed evidence establishes the practice of the insurer to refuse as a standard risk what it has accepted because of misrepresentation, it has the absolute right to rescind the policy (Home Life Ins. Co. v. Kupfer, 281 App. Div. 685).
In Metropolitan Life Ins. Co. v. Blum (7 A D 2d 488) where misrepresentation by the insured and proof of the insurer’s practice to refuse to assume such a risk, was demonstrated, a dismissal of the complaint at the end of the entire case, was affirmed. The court did not direct a new trial as in the Lindenbaum case, stating (p. 492): “It does not appear that defendants contested, either on the trial or on this appeal, the proposition that plaintiff would have rejected the applications for insurance had it been informed of the insured’s hypertensive vascular and heart conditions ’ ’.
In the case at bar, on behalf of the defendant, Dr. Winter testified that he is its Chief Medical Examiner; that he has been such for the company for the past 25 years; that he has the sole responsibility for passing upon and accepting or refusing to accept any applications for insurance with the company; that he has been passing upon approximately 100 applications per week for the company. He also testified that he was familiar with the underwriting standards of Ms company, which he used in making a decision as to whether to accept or reject risks and plaintiff took no issue with or questioned this.
This testimony of Dr. Winter shows how markedly different his status with defendant company is from that of an associate medical director of a giant life insurance company, such as Equitable Life Assurance Society, whose annual business runs into hundreds of millions and requires many associate medical directors in various areas of the country and who of necessity for uniformity are subject to rules and manuals of their com- *733 party as to its practice with respect to passing* upon life insurance risks.
Dr. Winter further testified unequivocally that had he known of the decedent’s history of syphilis and the history of treatment given for it, he definitely would not have accepted the risk, even if the decedent had been cured of the disease; that he would have never approved of any applicant if he had known of a history of syphilis. On cross-examination he stated that there are three stages of syphilis, primary, secondary and tertiary. He further testified that syphilis can stimulate any disease in the body and that in the primary stage organic damage can be caused to the brain, spleen, and in fact, it can attack any organ in the body; that it can cause cirrhosis of the liver, which may continue even if all vestige of syphilis is cured.
Further, he testified that he would have viewed Dr. Nesbitt’s treatment of the deceased as very unfavorable and Avould not upon that have approved the issuance of the policy.
The testimony of Dr. Winter stands in the record clear, positive and unequivocal. It is not in the least controverted or impeached. Under these circumstances, even though he represented the company, it has been declared that the credibility of such testimony unrefuted, may not be capriciously or arbitrarily rejected by the jury, as it has in this case (Lomer v. Meeker, 25 N. Y. 361, 363).
The defendant has clearly established its defense of material misrepresentation. The proof of the misrepresentation is documentary, and the proof wholly unassailed or impeached as to its materiality has met the requirements of the New York statute and decisions.
The jury chose to ignore the laAV and to substitute its own decision of what risk the company should have taken for the company’s. This it has no right to do. (See New York Life Ins. Co. v. Miller, 17 Misc 2d 532.)
The verdict may not stand. It should be set aside, and in view of the proof in this case, a verdict will be directed in favor of the defendant (Blum v. Fresh Grown Preserve Corp., 292 N. Y. 241). The defendant’s motions to this effect are granted. Judgment may accordingly be entered.
Other points raised, including good health of the insured, need not be considered.

 See Record on Appeal, fols. 685-721; 762-766.